*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. THOMPSON, Minor.

UNPUBLISHED
May 9, 2019

Nos. 346232; 346233
Jackson Circuit Court
Family Division
LC No. 18-000862-NA

Before: BOONSTRA, P.J., and METER and FORT HOOD, JJ.

PER CURIAM.

In Docket No. 346232, respondent-father appeals as of right an order terminating his parental rights to a minor child, KT, under MCL 712A.19b(3)(b)(*i*) (perpetration of physical abuse against the child, and reasonable likelihood of future injury or abuse), MCL 712A.19b(3)(b)(*ii*) (failure to prevent physical abuse of the child, and reasonable likelihood of future injury or abuse), (j) (reasonable likelihood of harm to the child), and (k)(*iii*) (severe physical abuse against the child, and reasonable likelihood of future harm). In Docket No. 346233, respondent-mother appeals as of right the same order, by way of which the court terminated her parental rights to KT under the same statutory grounds. We affirm in both appeals.

Respondents brought KT, who was less than three months old at the time, to a hospital on April 5, 2018, and doctors discovered that he had a skull fracture and bleeding in his brain. Respondents insisted at trial that the injuries occurred because KT had accidentally hit his head on a table in a laundromat on April 4, but petitioner presented evidence that respondents did not provide this explanation until several days later, on April 9, and had in fact specifically denied that anything of note had occurred on April 4 at the laundromat. The court, relying in part on respondents' changing stories and on the fact that KT showed signs of additional physical abuse, terminated respondents' parental rights after a combined adjudicative and dispositional proceeding. The court opined that it was likely respondent-mother who had inflicted KT's injuries but concluded that it did not need to decide definitively which parent inflicted the abuse because both parents—and solely the parents—had been responsible for KT's care.

## I. STATUTORY GROUNDS FOR TERMINATION

-1-

Respondents argue that the trial court erred by finding statutory grounds for termination of their parental rights. We disagree.

To terminate parental rights, the trial court must initially find, by clear and convincing evidence, a statutory ground for termination, MCL 712A.19b(3), and this Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if, even if some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*.

MCL 712A.19b(3) states, in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or sexual abuse under 1 or more of the following circumstances:
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> (*ii*) The parent who had the opportunity to prevent the physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.
>
> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:
>
> * * *

(*iii*) Battering, torture, or other severe physical abuse.[1]

It is not disputed that KT, who was less than three months old, suffered a fractured skull and a brain bleed before his transportation to the hospital on April 5, 2018. A key issue for the trial court was whether respondent-mother or respondent-father inflicted these injuries intentionally or whether they resulted from an accident. Respondents insisted that the injuries occurred as a result of the alleged accident at the laundromat. The court forcefully concluded that respondents were lying about the laundromat incident and had "concoct[ed]" it. This Court defers to the trial court's assessment of the credibility of witnesses. *In re Gach*, 315 Mich App 83, 93; 889 NW2d 707 (2016). In addition, the credibility of this explanation is starkly called into question by evidence in the record. An investigator with Child Protective Services (CPS) testified that soon after KT was taken to the hospital, respondents "were adamant that no accident had occurred" and specifically denied that anything untoward had happened at the laundromat on April 4. She stated that respondents did not inform her about the laundromat theory until April 9, despite respondent-father's claims at trial that he mentioned it on April 5. In addition, respondent-mother's testimony at trial regarding the timing of the "laundromat" explanation kept changing. Respondent-mother said she first mentioned the laundromat theory to someone other than respondent-father—specifically, her mother—on Friday, April 6, the day after taking KT to the hospital. On cross-examination, she stated that she mentioned the laundromat incident earlier, at the hospital, to some unspecified nurses, but "no one ever really made a big deal out of it, because I said he was okay." She later contradicted herself again, saying that she "didn't talk to any like nurses about it, you know what I mean?" Respondent-mother subsequently stated that she told a team of three people at the hospital on April 6 about KT hitting his head at the laundromat; she stated that "everyone kind of brushed it off, because it wasn't what happened, because I kept saying how great he was afterwards."

In addition, respondent-father testified that he saw KT "kind of flail himself when [respondent-mother] was going to rest him down and that's kind of how the incident happened" at the laundromat, and the CPS investigator testified that on April 9, respondent-mother told her that KT had "thr[own] himself back and hit his head on the table." But respondent-mother, in her trial testimony, did not mention any "flailing" and said that the incident occurred because she had simply been moving KT too fast, and therefore KT's head hit the hard edge of the table.[2] In addition, HMT (KT's grandmother and foster mother) testified that respondents had given varied explanations for KT's injuries.

---

[1] The amendments of MCL 712A.19b that went into effect on June 12, 2018, see 2018 PA 58, did not affect subparagraphs (3)(b) or (3)(j). The amendments reworded subparagraph (k) to add the clause about a reasonable likelihood of future harm. 2018 PA 58.

[2] The trial court concluded that respondent-mother changed her story about how the alleged incident at the laundromat unfolded because her first version, involving KT throwing back his head, failed to explain why the fracture was on the side of KT's head and not the back of his head.

Even though it is not the job of this Court to assess credibility, *id*., the record provides ample reason to find the "laundromat incident" explanation for KT's head injuries to be wanting in credibility. In addition, the child-protection team indicated that this explanation for KT's injuries was "not really plausible." And KT had had other injuries, too, including bilateral upper extremity bruises, tongue bruising, and an abrasion on his chin. Dr. Bethany Mohr found on KT what she believed to be a broken rib in the process of healing. Respondents admitted that they had been the sole individuals to provide care for KT.

It is important to view all of this information together instead of viewing each piece separately. KT incurred a skull fracture and a brain bleed, respondents lied about these injuries having occurred during an accident at the laundromat, the explanation was not plausible at any rate, KT had incurred multiple other injuries, KT was an infant, and respondents were his sole caregivers. In light of the evidence, including the evidence of ongoing deception, we do not have a "definite and firm conviction" that the trial court made a mistake by finding that respondent-mother or respondent-father intentionally caused KT's head injuries. *In re Mason*, 486 Mich at 152 (quotation marks and citations omitted).

The trial court found it most likely that respondent-mother inflicted the abuse but, citing *In re Ellis*, 294 Mich App 30; 817 NW2d 111 (2011), concluded that it did not need to decide definitively whether this was the case. In *In re Ellis*, an infant was brought to a hospital with many injuries, including multiple skull fractures. *Id*. at 31. "Neither respondent was able to provide an explanation for these severe injuries, and they agreed that they were [the child's] only caretakers." *Id*. at 32. This Court stated, "The most significant and interesting argument respondents raise is that it is impossible to determine which of them committed this heinous abuse of the minor child." *Id*. at 33. The Court concluded:

> We hold that termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries. The evidence in this case clearly shows that [the child] suffered numerous nonaccidental injuries that likely occurred on more than one occasion and that the parents lived together, shared childcare responsibilities, and were the child's sole caregivers. The trial court did not clearly err by finding that the statutory grounds for termination of respondents' parental rights were established by clear and convincing evidence and that termination of respondents' parental rights was in the child's best interests. [*Id*. at 35-36.]

In light of *In re Ellis*, termination under the statutory grounds relied on by the trial court could occur even though the evidence failed to demonstrate conclusively whether respondent-mother or respondent-father inflicted the injuries on KT. See also *In re VanDalen*, 293 Mich App 120, 141; 809 NW2d 412 (2011) ("[T]ermination of parental rights under MCL 712A.19b(3)(j) and MCL 712A.19b(3)(g) is permissible even in the absence of determinative evidence regarding the identity of the perpetrator when the evidence shows that the respondents must have either caused the intentional injuries or failed to safeguard the children from injury."). Respondents contend that the trial court should not have relied on *In re Ellis* to terminate their parental rights because the injuries incurred by the child in that case were much more severe than

the injuries incurred by KT. It is true that the injuries in *In re Ellis* were more extensive than the injuries to KT. *In re Ellis*, 294 Mich App at 31. But the trial court in the present case properly relied on various pieces of evidence, such as deceptiveness and multiple injuries, to conclude that intentional abuse had been inflicted, and relied on *In re Ellis* merely for the proposition that the court did not need to decide *which* respondent inflicted the abuse. In other words, the court was not relying on the extent of the injuries to the child in *In re Ellis* but on the panel's legal reasoning that the termination grounds could be established as long as one parent inflicted the abuse and the other parent failed to protect the child. In addition, that a child's injuries in one case (*In re Ellis*) were extremely severe does not mean that KT's comparatively "less serious" injuries were not also severe. KT suffered a fractured skull and a brain bleed, and he had developed a problem with his hearing. While it was not definitively established that the hearing issues were related to the head injuries, the hearing issues were not noticed until after the injuries. And respondent-mother "asked [HMT] not to pursue any of the . . . appointments dealing with [KT's] hearing issue, because it . . . makes [respondent-mother] look bad."[3]

Respondents contend that even though KT incurred injuries, there was no reasonable likelihood of future harm to him because respondents were participating in services such as parenting classes, a neutral witness did not view them as posing a risk of harm to KT, they had a safe and appropriate home, and certain relatives testified that they were good parents. As noted, however, the evidence supported the trial court's finding of intentional, serious head injuries inflicted upon KT. In addition, the foster-care worker testified about her inability to communicate with respondents in a productive manner, and according to HMT, respondent-mother stated at one point that respondents had not needed to bring KT to the hospital for his head injuries. Given that respondents could not even acknowledge and address the fact that KT had been intentionally injured, the trial court did not clearly err by finding that there was indeed a reasonable likelihood that KT would be injured in the future if returned to respondents' home. We agree with the trial court's determination that termination of respondents' parental rights was appropriate pursuant to MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j) and k(*iii*).

## II. BEST INTERESTS

Respondents contend that the trial court erred by finding that it was in KT's best interests to terminate their parental rights. We disagree.

We review for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

---

[3] We do not agree with respondents' attempts to characterize KT's head injuries as minor or insignificant. Respondents also imply that the evidence of KT's rib fracture was speculative, but there was an abnormality in his bone scan that Dr. Mohr believed to be a healing fracture, and this evidence, while not particularly strong *on its own*, must be viewed together with all the other evidence. Respondent-mother also contends that no "witnesses testified about a skin abrasion on [KT's] chin," but the evidence of the chin abrasion is in the medical records, which were admitted into evidence.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5).

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted.]

A primary contention by respondents in connection with this issue is that KT was harmed by accident. We have addressed that contention in part I of this opinion—the trial court did not clearly err by finding that KT was intentionally harmed. In addition, KT was "thriving" in HMT's care. In *In re VanDalen*, 293 Mich App at 142, the Court stated, "Given that the children's safety and well-being could not reasonably be assured in light of the past severe abuse of the children while in respondents' care, which remained unresolved, and that the children were thriving in the care of their foster parents, the court did not clearly err by finding that termination of respondents' parental rights was in the children's best interests." The situation in *In re VanDalen* is analogous to the situation in the present case.

In addition, evidence showed that respondents were not willing to admit that KT had an issue with his hearing, but HMT was proactive in trying to address it. HMT testified that respondents argued against anything she did to try to benefit KT. She also said that she did not believe that respondents had KT's best interests "at heart," and she admitted that respondent-father (her son) needed to "get his stuff together" and "grow up a little." She also testified that respondent-mother had trouble bonding with KT. Moreover, according to HMT and as noted in part I of this opinion, respondent-mother had expressed that respondents had not needed to bring KT to the hospital for his head injuries. Finally, HMT was willing to adopt KT.

Despite the existence of some favorable evidence about respondents' parenting abilities, the trial court did not clearly err by finding that under all the circumstances, it was in KT's best interests to terminate respondents' parental rights.

## III. REASONABLE EFFORTS TOWARDS REUNIFICATION

Respondent-father argues that petitioner, the Department of Health and Human Services (DHHS), should have offered additional services to reunify the family. This Court has stated that to preserve an argument about reasonable efforts for family reunification, a parent must object to services offered at the time they are offered. *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012), citing *In re Terry*, 240 Mich App 14, 27; 610 NW2d 563 (2000). The Michigan Supreme Court recently expressed some skepticism about this rule but declined to

overturn it. *In re Hicks*, 500 Mich 79, 88-89; 893 NW2d 637 (2017). Respondent-father *was* offered certain services in this case, such as visitations and parenting classes, but there is no indication that he formally requested further services except in conjunction with arguing at the end of the trial that the court should refrain from terminating parental rights and instead institute a case-service plan. At trial, the foster-care worker testified that respondents completed psychological evaluations and parenting classes and had been "proactive in asking about further services, but nothing is available with the current goal of termination." The foster-care worker did not identify when or in what manner respondents had "ask[ed]" about further services, and the record fails to demonstrate that respondent-father objected to the fact that DHHS was refraining from offering further services in light of the goal of termination. As such, this issue is unpreserved.[4]

This Court reviews unpreserved issues for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). As noted in *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), under the plain-error doctrine, even if a plain (i.e., a "clear or obvious") error occurs, reversal is not warranted unless the plain error "affected substantial rights," i.e., "affected the outcome of the lower court proceedings." And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id.* at 763-764 (citation, quotation marks, and brackets omitted).]

As a general matter, DHHS is required to make reasonable efforts to reunify a family after removing a child from his or her home. *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). There are, however, exceptions to this rule. See *In re Frey*, 297 Mich App at 247 (acknowledging that the requirement that reasonable efforts be undertaken to reunite a family is subject to "limited exceptions[.]").

MCL 722.638 states, in part:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply:

> (a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:

---

[4] Indeed, it is not reasonable to equate "asking about further services" to objecting to the process implemented by DHHS.

* * *

(*iii*) Battering, torture, or other severe physical abuse. . . .

(2) In a petition submitted as required by subsection (1), if a parent is a suspected perpetrator or is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk, the department shall include a request for termination of parental rights at the initial dispositional hearing as authorized under section 19b of chapter XIIA of 1939 PA 288, MCL 712A.19b.

In *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009), the Court relied on MCL 722.638 and MCR 3.977(D)[5] in determining that in cases involving aggravated circumstances— such as certain sexual abuse or "severe physical abuse," see MCL 722.638(1)(a)(*iii*)— reunification services need not be provided because DHHS is required to seek termination. The Court stated, "[W]hen petitioner filed its first petition to terminate respondent's parental rights . . . , it was not required to provide respondents with any reunification services" or parenting time. *In re HRC*, 286 Mich App at 463. It concluded that "[p]etitioner . . . is not required to provide reunification services when termination of parental rights is the agency's goal." *Id*. In DHHS's petitions in the present case, it sought termination as the desired initial disposition and alleged "severe physical abuse." Based on the wording of MCL 722.638(1)(a)(*iii*) and (2), DHHS was mandated to seek termination because of this severe abuse. Therefore, according to *In re HRC*, 286 Mich App at 463, reunification services were not required. *In re HRC* is binding upon this Court under MCR 7.215(J)(1).

The only legal authority respondent-father cites in support of his argument that DHHS offered insufficient services is *In re Newman*, 189 Mich App 61; 472 NW2d 38 (1991). In that case, the Court reversed a termination order, concluding that DHHS's efforts to rectify the conditions of a dirty home and inadequate supervision of their children had not been reasonable. *Id*. at 66-70. *In re Newman* is distinguishable because DHHS in that case initially sought *temporary* jurisdiction, *not* based on aggravated circumstances such as severe physical abuse, and even after termination was ordered, the trial court suspended the order to give the parents time to rectify the conditions. *Id*. at 63-64. By contrast, DHHS in the present case sought termination from the start of the case. *In re Newman* simply does not support defendant's argument in the present case, and as such defendant has failed to properly support this portion of his appeal. See *Wilson v Taylor*, 457 Mich 232, 242; 577 NW2d 100 (1998) (noting that an appellate court will not unravel an appellant's arguments for him). Respondent-father has not established entitlement to relief under the plain-error doctrine with regard to this unpreserved issue.

IV.  RIGHT TO A SEPARATE DISPOSITIONAL HEARING

---

[5] This rule allows for suspension of parenting time when termination is sought.  MCR 3.977(D).

Respondent-father argues that the trial court erred by failing to hold a separate dispositional hearing after the trial. We disagree.

During the very first pretrial hearing, on April 11, 2018, the court stated that "[t]rial . . . will be a combined trial and adjudication and disposition [sic]." Respondent-father's attorney raised no objection and instead moved on to discussing visitation arrangements. On August 15, 2018, the parties agreed to a two-week adjournment of the trial to await an expert medical report. Respondent-father's attorney requested that KT be moved to a placement closer to respondents, to facilitate visitations. Petitioner's attorney stated that "a change in placement would be looked at if this ends up becoming a temporary situation," but argued that the court should wait to make any changes until the end of the trial. The court asked, "[I]s this a combined adjudication and termination?" and petitioner's attorney responded, "Yes." The court declined to change KT's placement but stated that it would be "very receptive" to changing it if the court decided not to terminate respondents' parental rights. In response, respondent-father's attorney asked for home studies "in the interim, so in the event that occurs we can address that at that time." Given the sequence of the statements at this hearing, it is evident that respondent-father's attorney was, again, not objecting to the court's decision to combine the adjudication and initial disposition.

Also on August 15, 2018, the court issued an order stating that the "BENCH TRIAL/DISPOSITIONAL hearing" would be adjourned to August 29, 2018. On August 22, 2018, the court issued an order stating that the "BENCH TRIAL/DISPOSITIONAL HEARING" would be adjourned and that the "BENCH TRIAL/DISPOSITION" would occur on September 12, 2018. On September 12, 2018, the court issued an order stating that the "BENCH TRIAL/DISPOSITIONAL hearing" would be adjourned to September 26, 2018. Thereafter, respondent-father and his attorney appeared at trial and fully participated in the proceedings. During closing arguments, respondent-father's attorney spent considerable time arguing that the statutory grounds for termination had not been established. In fact, the attorney seemed close to conceding the issue of adjudication/jurisdiction and focused on arguing that the court should not terminate respondents' parental rights. Clearly, he was treating the trial as a process for determining what the initial disposition would be.

Given the circumstances, we conclude that respondent-father has waived the current issue. See *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003) ("[A] waiver is a voluntary and intentional abandonment of a known right."). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009). Even disregarding the waiver, respondent-father has not established any entitlement to relief in connection with this unpreserved issue.

In arguing that the trial court erred by failing to hold a dispositional hearing separate from the trial, respondent-father cites MCR 3.972, MCR 3.973, and MCR 3.977. MCR 3.972 deals with the procedure for the trial in a child-protective proceeding. MCR 3.973 deals with dispositional hearings and states, in part:

> **(A) Purpose.** A dispositional hearing is conducted to determine what measures the court will take with respect to a child properly within its jurisdiction and, when applicable, against any adult, once the court has determined following

-9-

trial, plea of admission, or plea of no contest that one or more of the statutory grounds alleged in the petition are true.

**(B) Notice.** Unless the dispositional hearing is held immediately after the trial, notice of hearing may be given by scheduling it on the record in the presence of the parties or in accordance with MCR 3.920.

**(C) Time.** The interval, if any, between the trial and the dispositional hearing is within the discretion of the court. When the child is in placement, the interval may not be more than 28 days, except for good cause.

MCR 3.977 states, in part:

**(E) Termination of Parental Rights at the Initial Disposition.** The court shall order termination of the parental rights of a respondent at the initial dispositional hearing held pursuant to MCR 3.973, and shall order that additional efforts for reunification of the child with the respondent shall not be made, if

(1) the original, or amended, petition contains a request for termination;

(2) at the trial or plea proceedings, the trier of fact finds by a preponderance of the evidence that one or more of the grounds for assumption of jurisdiction over the child under MCL 712A.2(b) have been established;

(3) at the initial disposition hearing, the court finds on the basis of clear and convincing legally admissible evidence that had been introduced at the trial or plea proceedings, or that is introduced at the dispositional hearing, that one or more facts alleged in the petition:

(a) are true, and

(b) establish grounds for termination of parental rights under MCL 712A.19b(3)(a), (b), (d), (e), (f), (g), (h), (i), (j), (k), (*l*), (m), or (n);

(4) termination of parental rights is in the child's best interests.

As noted in *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006), child-protective proceedings have two distinct phases, the adjudicative phase and the dispositional phase. For the adjudicative phase, the respondent has a right to a jury trial, and the pertinent question for this phase is whether the child comes within the jurisdiction of the court. *Id.* The dispositional phase involves determining the action to take with respect to the child. *Id.* at 537. In the present case, petitioner sought termination (as opposed to the implementation of a case-service plan) as the initial disposition, and the trial court agreed with this disposition. Respondent-father contends that before making this disposition, the court should have held a separate dispositional hearing.

In *In re AMAC*, *id.* at 538, the Court stated:

In this case, there was an adjudicative hearing that concluded with the trial court rendering its written opinion and order terminating respondent's parental rights without a dispositional hearing either immediately following the trial or by proper notice after the trial. See MCR 3.973(B). We construe the plain and ordinary language of MCR 3.973(A) as requiring a dispositional hearing to be conducted to determine what measures the court will take with respect to a child properly within its jurisdiction[.] Clearly, the dispositional hearing is to be held after the adjudicative phase of the proceeding in which it was determined that the child was properly within the court's jurisdiction. See MCR 3.973(A). And the dispositional hearing must be held either immediately following the adjudicative hearing or after proper notice. See 3.973(B). Therefore, the trial court erred here in not affording respondent her right to a dispositional hearing. [Quotation marks and citations omitted.]

The Court in *In re AMAC* vacated the order terminating the respondent's parental rights. *Id*. at 541.

*In re AMAC*, however, is not on the same footing as the present case. In *In re AMAC, id*. at 535, reference was made at trial to a future hearing regarding the child's best interests, and respondent's counsel "indicated that certain witnesses would be called" at this hearing but not at the adjudicative trial. This best-interests hearing never took place. See *id*. at 539-540. In addressing the respondent's argument on appeal about the right to a separate dispositional hearing, this Court stated that "[t]he dispositional phase is particularly important . . . because it provides the respondent with an opportunity to persuade the court that, although a statutory ground for termination is met, termination is not in the best interests of the child." *Id*. at 538-539. The Court noted that because the respondent's parental rights to other children had been terminated in the past and this prior termination provided statutory grounds for the termination at issue, the dispositional hearing was crucial for addressing whether termination would be in the best interests of the child. *Id*. at 539. The Court, citing MCL 712A.19b(5) (the rule discussing best interests), stated, "Without a dispositional hearing, a respondent is denied the opportunity to present evidence that was not admissible or relevant in the adjudicative phase of the proceeding in an attempt to prove that termination" is not in the child's best interests. *In re AMAC*, 269 Mich App at 539. The Court relied, in part, on MCL 712A.19b(5) in vacating the order terminating the respondent's parental rights. *In re AMAC*, 269 Mich App at 540.

In the present case, there is no indication that any party was deprived of the opportunity to present evidence pertinent to jurisdiction, statutory grounds for termination, or best interests. The parties were aware from the first pretrial hearing that the trial would address jurisdiction *and* termination. Respondent-father never requested a jury determination of jurisdiction. In addition, and contrary to respondent-father's assertion on appeal, the court made a separate finding regarding adjudication/jurisdiction, stating that its recited findings concerning grounds for termination "support the [c]ourt taking jurisdiction over [KT]."[6] The court entered an order of

---

[6] Contrary to respondent-father's implication, the same evidence can support the taking of jurisdiction and the termination of parental rights. See MCR 3.977(E)(3).

adjudication and a termination order. The court also made separate findings regarding best interests. Considering all these circumstances, respondent-father has not established plain error affecting his substantial rights. *Carines*, 460 Mich at 763.

Respondent-father argues that the court violated MCR 3.972(B)(2) by failing to read the allegations in the petition at trial. It is true that the court did not read the allegations and that respondent-father did not waive the reading of them. See MCR 3.972(B)(2). But respondent-father has not indicated that he was unaware of the allegations or that the failure by the court to read them somehow prejudiced him. *Carines*, 460 Mich at 763. Respondent-father, citing MCR 3.973(E), also argues that the rules of evidence do not apply at dispositional hearings.[7] But this is not the case when, as in the present case, termination is sought as the initial disposition. See MCR 3.977(E)(3). MCR 3.977(E)(3) indicates that the court may terminate parental rights at the initial disposition "on the basis of clear and convincing legally admissible evidence that had been introduced at the trial or plea proceedings, or that is introduced at the dispositional hearing . . . ."

Quite simply, respondent-father has not alleged how or even *that* he was prejudiced as a result of how the trial court conducted the proceedings in this case. As such, he has not established any entitlement to relief under the plain-error doctrine. *Carines*, 460 Mich at 763-764.

Affirmed.

/s/ Mark T. Boonstra
/s/ Patrick M. Meter
/s/ Karen M. Fort Hood

---

[7] Presumably, respondent-father is attempting to imply that he could have presented further, "non-admissible" evidence at a dispositional hearing that would have furthered his position. He does not, however, indicate what such evidence might have been.